# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 168 | **DATE** | 7/1/2003 |
| **CASE TITLE** | Longview Aluminum, et al vs. Industrial General, etal | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Counterclaimants' motion for partial summary judgment (66-1) is denied. Individual Counter-defendants' cross-motion for summary judgment is granted. Kolleng's individual motion for summary judgment (72-1) is denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JUL 02 2003 date docketed | 105 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 7/1/2003 | |
| | | 03 JUL -1 PM 3:28 | date mailed notice | |
| GI. | courtroom deputy's initials | | GL | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LONGVIEW ALUMINUM, L.L.C., a Delaware Limited Liability Company, MICHIGAN AVENUE PARTNERS, L.L.C., an Illinois Limited Liability Company, MICHAEL LYNCH, JOHN KOLLENG, JAMES McCALL, JR., MATTHEW OCHALSKI, DOMINIC FORTE<br><br>    Plaintiffs/Counter-Defendants,<br><br>v.<br><br>INDUSTRIAL GENERAL, L.L.C., a, Nevada Limited Liability Company, and THEODOR BODNAR, individually and d/b/a Pension Plan Advisors,<br><br>    Defendants/Counterclaimants. | **DOCKETED**<br>JUL 0 2 2003<br><br><br><br>Case No. 02 C 0168 |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

This action arises from a series of three agreements Defendants/Counterclaimants Industrial General, L.L.C. ("Industrial General") and Theodor Bodnar ("Bodnar") entered into with Plaintiffs/Counter-Defendant Michigan Avenue Partners, L.L.C. ("MAP"). On December 7, 2001, Plaintiffs Longview Aluminum, L.L.C. ("Longview Aluminum"), MAP, Michael Lynch ("Lynch"), John Kolleng ("Kolleng"), James McCall, Jr. ("McCall"), Matthew Ochalski ("Ochalski") and Dominic Forte ("Forte") filed an action against Defendants Industrial General and Bodnar seeking a declaration that Plaintiffs could not be held liable for the debts and obligations of MAP because of its purported status as a limited liability company. On January 28, 2002, Defendants filed a two count counterclaim against Plaintiffs alleging breach of contract (Count I) and, in the alternative, quantum meruit (Count II).

Presently before us is Counterclaimants' motion for partial summary judgment on the counterclaim.[1] Also before us is the cross-motion of Lynch, Kolleng, McCall, Ochalski, and Forte (collectively, the "Individual Counter-Defendants") for summary judgment on the counterclaim as well as Kolleng's separate individual motion for summary judgment on the counterclaim. For the reasons set forth below, we deny Counterclaimants' motion, grant the Individual Counter-Defendants' motion, and deny Kolleng's motion as moot.

I. BACKGROUND[2]

On or about October 19, 2000, Counterclaimants Industrial General and Bodnar entered into a series of three agreements with Counter-Defendant MAP regarding MAP's potential acquisition of the Longview Reduction Plant (the "Longview Acquisition") and Bodnar's efforts to locate financing for that acquisition. At all relevant times, Bodnar, a resident of Ventura County, California, was doing business as a finance and investment finder under the name Pension Plan Advisors. Bodnar was also serving, and continues to serve, as the managing member of Industrial General, a Nevada limited liability company. MAP was formed as an Illinois limited liability company on November 21, 1997. Since that time, MAP has remained a duly-registered limited liability company in good standing with the State of Illinois.[3]

---

[1]Counterclaimants' motion states that they are seeking partial summary judgment against Counter-Defendant Longview Aluminum but fails to state any basis for summary judgment against Longview, nor seeks any relief with respect to Longview. Also, in an appearance before this Court on April 15, 2003, counsel for counterclaimants stated that their motion does not seek partial summary judgment against Longview Aluminum. For these reasons, we consider Counterclaimants' motion to seek partial summary judgment against Counter-Defendant MAP and the Individual Counter-Defendants only.

[2]The following facts are culled from the parties' Local Rule 56.1 Statements of Material Facts.

[3]In their response to the Individual Counter-Defendants' Local Rule 56.1 Statement of Material Facts, Counterclaimants "disputed . . . [f]or the purposes of this action" the statement located in ¶4 that MAP "was formed as an Illinois limited liability company on November 21, 1997 and has remained a duly-registered limited liability company in good standing with the State of

During the course of the negotiation regarding the three agreements, John M. Babirak ("Babirak"), Director of Finance & Acquisitions for MAP, sent a letter to Bodnar dated June 6, 2000 on MAP letterhead.[4] The letterhead contains the name "Michigan Avenue Partners" without including the designation "L.L.C." or some other reference to MAP's limited liability status. In his letter, Babirak states that MAP "does not operate as an acquisition entity, *per se*, but as a collection of individuals that invests in separate business opportunities." Babirak's letter identified the "collection of individuals" as the Individual Counter-Defendants and disclosed that those individuals had invested in four metals businesses: McCook Metals, L.L.C., Scottsboro Aluminum, L.L.C., Great Lake Metals, L.L.C., and Great Lakes Processing, L.L.C. Babirak did not refer to MAP as a "limited liability company" or otherwise dislcose MAP's limited liability status. Babirak did not refer to MAP as a "partnership," and did not refer to the Individual Counter-Defendants as "partners."[5] Nevertheless, Bodnar concluded that MAP was a partnership based on the representations Babirak made in his letter.

---

Illinois since its formation in 1997." Local Rule 56.1(b)(3)(A) dictates that a response to a moving party's Rule 56.1 statement be "concise" and must contain "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Counterclaimants' explanation for disputing the statement, which stretches on for seven pages, contains narrative sections and a discussion of Illinois law regarding partnerships. Significantly, their response does not contain any evidence disputing that MAP was formed as an Illinois limited liability company on November 21, 1997, and has since remained a duly-registered limited liability company in good standing with the State of Illinois. We therefore deem the Individual Counter-Defendants' statement of fact admitted. We will resolve the issue of whether MAP was a limited liability company for the purposes of this action in the Analysis Section, *infra* II.

[4]Copies of the letter were sent to "Michael Lynch, *Michigan Avenue Partners*, John Kolleng, *Michigan Avenue Partners*, [and] James McCall, *Michigan Avenue Partners*." Babirak has no recollection of showing Lynch the letter before sending it to Bodnar. However, it was customary for Babirak to submit such a letter to Lynch for his review prior to sending the letter to its recipient because it contained representations regarding equity financing – a subject over which Babirak had no authority.

[5]At his deposition, Babirak testified that no one ever told him that MAP was a "general partnership" or a "limited liability company." Babirak stated that the Individual Counter-Defendants referred to one another as "partners."

3

Enclosed with the letter were the biographies of the Individual Counter-Defendants, each of which appeared on MAP letterhead, as described above.[6] Lynch's biography began with a description of his role as "Chairman of Michigan Avenue Partners, L.L.C." Pursuant to the Operating Agreement of MAP, Lynch also acts as the sole managing member of MAP. Kolleng's biography lists his position as "Vice Chairman and General Counsel" in bold underneath his name, which also appears in bold, near the top lefthand corner of the page. McCall's position as "Vice Chairman," and Ochalski's position as "President and Chief Operating Officer" are similarly identified. Forte is identified as "Chief Investment and Development Officer for Michigan Avenue Partners ("MAP"), a Chicago based privately held buyout firm."[7] Bodnar admits that he saw the biographies of the Individual Counter-Defendants after June 6, 2000 – the date of Babirak's letter.

Bodnar drafted a series of three agreements, the first of which was the Non-Disclosure and Non-Circumvention Agreement (the "Non-Disclosure Agreement") Bodnar and MAP entered into on or about October 19, 2000. Lynch signed the Agreement on behalf of MAP as its "Authorized Principal."[8] The

---

[6] Also enclosed with the letter was "a check for $15,000 to cover the estimated costs of the feasibility analysis." Babirak Letter.

[7] In his affidavit, Kolleng states that he is "the former Vice Chairman and General Counsel of McCook Metals, L.L.C." ¶2. He further avers that he has "never been a member of Michigan Avenue Partners, L.L.C. ("MAP"), or had any other form of financial or other interest in MAP." Ochalski states in his affidavits that he is "the former President of McCook Metals, L.L.C." and has "never been a member of Michigan Avenue Partners, L.L.C. ("MAP"), or had any other form of financial or other interest in MAP." ¶¶1-2. McCall and Forte aver that they are former non-managing minority members of MAP. See McCall Aff. ¶1; see also Forte Aff. ¶1. Forte states that he has had no membership or any other form of financial interest in MAP since January 2000. See Forte ¶1.

[8] Counterclaimants, in their Local Rule 56.1 Statement, set forth that Lynch signed the Non-Disclosure Agreement as the "Authorized Principal" of MAP. The Individual Counter-Defendants admitted that fact. Counterclaimants subsequently set forth, in their response to the Individual Counter-Defendants' Local Rule 56.1 Statement, that Lynch signed the Agreement in his individual capacity as well. The Individual Counter-Defendants have disputed that fact, an issue we address in the Analysis Section, *infra* II.

Non-Disclosure Agreement binds the parties to certain terms governing Bodnar's introduction of three potential financial sources, including U.S. Bancorp Libra ("Libra"), to MAP for the Longview Acquisition. The Agreement does not discuss a salary or other dollar amount due to Bodnar for performing under the Agreement. Paragraph six of the Agreement provides that:

> [t]he parties agree that this Agreement [shall] bind any company corporation, organization, partnership, fund, trust or any other association with which they are associated or from which they derive financial benefit and shall further bind any affiliate, employee, consultant, agent, relative or representative of any of the foregoing.[9]

The second agreement Bodnar drafted was the Letter of Confirmation and Acceptance (the "Finder's Fee Agreement") which Bodnar and MAP entered into on or about October 19, 2000. Lynch, described in the Agreement as "Chairman" of MAP, initialed the Agreement "OK." Under the Finder's Fee Agreement, MAP agreed to pay Bodnar one percent (1%) of the financing MAP obtained from any source Bodnar introduced to MAP. The third agreement Bodnar drafted was the Letter of Confirmation and Acceptance of Options (the "Option Agreement") which Industrial General and MAP entered into on or about October 19, 2000. Lynch, described in the Agreement as "Chairman" of MAP, signed the Agreement "OK." Under the Option Agreement, MAP and the Reynolds Longview Reduction corporate entity gave Industrial General an option to acquire, for $100,000, the equivalent of three percent (3%) of the issued and outstanding common stock of Longview Aluminum within twenty-four months following the Longview Acquisition.[10]

---

[9]The parties dispute whether Lynch excised the language in Paragraph 6 stating that the Non-Disclosure Agreement shall bind the signatories "individually."

[10]It is unclear whether the Option Agreement's reference to the "Reynolds Longview Reduction corporate entity" was to Longview Aluminum, L.L.C., which was created one month before the close of the Longview Acquisition, or to the corporate entity which was operating the Longview Reduction Plan prior to the Longview Acquisition.

The three agreements do not refer to MAP as a "limited liability company" or otherwise refer to its limited liability status. Furthermore, the agreements do not refer to MAP as a "partnership" or to the Individual Counter-Defendants as "partners." Bodnar did not ask the Individual Counter-Defendants to enter into any guarantees for the amount owed to him under the agreements because of his conclusion, made after reading the Babirak Letter, that MAP was a partnership. While Bodnar only discussed his right to compensation with Lynch, neither party set forth evidence documenting that the parties discussed the personal liability of the Individual Counter-Defendants.

After the parties entered into the three agreements, Bodnar introduced MAP to Libra, one of the sources listed in the Non-Disclosure Agreement. Bodnar provided background information regarding MAP to Libra. In a September 5, 2000 letter to Libra, Bodnar explained that "MAP officers will include" Individual Counter-Defendants Lynch, Kolleng, and Forte. Bodnar did not refer to Lynch, Kolleng, and Forte as "partners." He also did not refer to MAP as either a "limited liability company" or as a "partnership." Libra's Confidential Private Placement Memorandum, written after Libra's receipt of Bodnar's letter, described MAP's Chairman Lynch as having served "as Chairman of Michigan Avenue Partners, L.L.C. since 1997." Lynch purportedly terminated the business relationship between Bodnar and MAP in a letter dated December 2, 2000, in which Lynch alleged that Bodnar had made false and misleading statements to induce MAP into a business relationship. Bodnar asserts that the letter was sent only after a dispute over the agreements arose. Libra ultimately provided $155,000,000 in financing for the Longview Acquisition, which was closed by Longview Aluminum, L.L.C., comprised of Lynch, Kolleng, McCall, Ochalski, and Forte.[11] MAP did not provide Bodnar with a

---

[11] Forte testified that the Individual Counter-Defendants had agreed that they would each have an ownership interest in Longview Aluminum prior to its formation. The Individual Counter-Defendants entered into similar agreements prior to forming the other four limited liability companies listed in the Babirak Letter.

6

finder's fee of $1,550,000 pursuant to the Finder's Fee Agreement. MAP similarly did not provide Industrial General with the option to acquire Longview Aluminum stock pursuant to the Option Agreement.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citations omitted). Once the moving party has met this burden of production, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

### B. Breach of Contract

#### 1. *Counterclaimants' Motion for Partial Summary Judgment*

Counterclaimants allege that the Counter-Defendants breached their contractual obligation to pay Bodnar his finder's fee of $1,550,000 under the Finder's Fee Agreement and to offer Industrial General the option to acquire Longview stock pursuant to the Option Agreement. Counterclaimants contend that MAP and the Individual Counter-Defendants are liable because MAP is a partnership by

estoppel under the Illinois Uniform Partnership Act, 805 ILCS 205/1 *et seq.* Section 205/16(1), which codifies the doctrine of partnership by estoppel, provides:

> [w]hen a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to any one, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership . . .

Although §205/16 "refers to the giving of credit, courts have nevertheless found that the phrase 'given credit to the actual or apparent partnership' relates not only to financial credit but also to detrimental reliance generally." *Manning v. Crockett*, 1999 U.S. Dist. LEXIS 1304, at *35 (N.D. Ill. Jan. 26, 1999) (surveying cases from a number of federal and state jurisdictions); *see also Bergan & Lefkow Ins. Agency v. Flash Cab Co.*, 249 N.E.2d 729, 736 (Ill. App. Ct. 1969).

Bodnar asserts that Babirak represented the Individual Counter-Defendants as partners with one another in the letter Babirak sent to Bodnar, dated June 6, 2000. In his letter, Babirak stated that MAP "does not operate as an acquisition entity, *per se*, but as a collection of individuals that invests in separate business opportunities." Babirak's letter identified the "collection of individuals" as the Individual Counter-Defendants and disclosed that those individuals had invested in four limited liability companies. Bodnar concluded that MAP was a partnership because of Babirak's description of MAP "as a collection of individuals." Bodnar consequently did not ask the Individual Counter-Defendants to individually guarantee the amount owed to him and Industrial General under the agreements.

The Individual Counter-Defendants respond that Babirak's description does not constitute a representation of MAP as a partnership in which the Individual Counter-Defendants are general partners. We agree. At the time he wrote the letter to Bodnar, Babirak was unaware of MAP's legal status -- having not been told that MAP was either a "partnership" or a "limited liability company." Although it was customary for Babirak to submit such a letter to Lynch for review, there is no evidence that Lynch

8

asked Babirak to represent MAP as a "partnership" or the Individual Counter-Defendants as "partners." Babirak's description of MAP does not include a reference to the Individual Counter-Defendants as "partners" or a reference to the entity as a "partnership." Indeed, Babirak's letter to Bodnar, as well as all other communication from MAP to Bodnar, is void of either word. Babirak's description of MAP "as a collection of individuals that invests in separate business opportunities" is not a definitive representation of MAP as either a partnership or a limited liability corporation. In fact, his description could arguably be used to describe either entity.

What clarifies Babirak's description, however, is Lynch's biography, which was enclosed with Babirak's letter. Lynch's biography described his role as "Chairman of Michigan Avenue Partners, L.L.C." Bodnar concedes that he saw Lynch's biography sometime after June 6, 2000, nearly four months before Bodnar entered into the three agreements on which he and Industrial General base their claim for breach of contract. After entering into the three agreements with MAP, Bodnar provided background information regarding MAP to Libra. Libra's Confidential Private Placement Memorandum, written after Libra's receipt of information from Bodnar, describes Lynch as having served "as Chairman of Michigan Avenue Partners, L.L.C. since 1997." Lynch's biography definitively represents MAP as a limited liability company rather than a partnership.

Bodnar contends he was unaware of MAP's status as an Illinois limited liability company because, aside from Lynch's biography, all other written and verbal communication he had with MAP and Lynch did not disclose MAP's status as a limited liability company. The Individual Counter-Defendants have provided documents from the Office of the Illinois Secretary of States demonstrating that MAP was formed as an Illinois limited liability company on November 21, 1997, and has since remained a duly-registered limited liability company in good standing with the State of Illinois. Under the Illinois Limited Liability Company Act, 805 ILCS 180/1-1 *et seq.*, "[t]he fact that the articles of

organization are on file in the Office of Secretary of State is notice that the limited liability company is a limited liability company and notice of all other facts set forth herein." §180/5-70. MAP's articles of organization therefore provided notice of MAP's status as a limited liability company.

Significantly, while Bodnar points out that MAP and Lynch did not refer to MAP's limited liability status, he does not claim to have relied on that omission to his detriment.[12] Even if he had made such a claim, MAP and the Individual Counter-Defendants would still be entitled to the protections afford by the Limited Liability Company Act. Under the Act, "[t]he name of each limited liability company as set forth in its articles of organization shall contain the terms 'limited liability company,' 'L.L.C.,' or 'LLC.'" §180/1-10(a)(1). Furthermore, it "shall be the name under which the limited liability company transacts business in this State unless the limited liability company also elects to adopt an assumed name or names as provided in this Act." §180/1-10(a)(5). Doing business under an unauthorized assumed name, however, is punishable only by fine. §180/1-20(h). "The failure of a limited liability company *to observe the usual company formalities* . . . is not a ground for imposing personal liability on the members or managers for liabilities of the company." §180/10-10(c) (emphasis added). Specifically, a company's failure to refer to its limited liability status in its name as required by state statute does not precipitate "the loss of all protections and advantages of the corporate form among them the fundamental protection of limited liability." 18A Am. Jur. 2d Corporations §275.

---

[12] Bodnar only claims to have relied on Babirak's description of MAP "as a collection of individuals that invests in separate business opportunities." Bodnar points to evidence he obtained during discovery that the Individual Counter-Defendants thought of one another and occasionally referred to one another as "partners." Bodnar also emphasizes his location of the McCook Metals, L.L.C. Operating Agreement ("McCook Agreement") in which MAP is defined as "an Illinois general partnership." Bodnar does not, however, claim to have had knowledge of or reliance on either piece of recently discovered material at the time he signed the agreements with MAP. As such, the evidence is inadmissible to demonstrate his detrimental reliance. *See Manning*, 1999 U.S. Dist. LEXIS 1304, at *39; *see also Mellor v. Carithers*, 1895 WL 2930, at *2 (Ill. 1895).

10

The protection of limited liability, as set forth by the Limited Liability Company Act, is expansive:

> the debts, obligations, and liabilities of a limited liability company, whether arising in contract, tort, or otherwise, are solely the debts, obligations, and liabilities of the company. A member or manager is not personally liable for a debt, obligation, or liability of the company solely by reason of being or acting as a member or manager. §180/10-10(a).

We decline to find MAP and the Individual Counter-Defendants to be a partnership by estoppel. Instead, we find that the Individual Counter-Defendants are entitled to the protections afforded by the limited liability status of MAP. Accordingly, we deny Counterclaimants' motion for partial summary judgment on their claim for breach of contract.

### 2. *Individual Counter-Defendants' Motion for Summary Judgment*

The Individual Counter-Defendants argue that in light of MAP's status as a limited liability company, they are not liable for the money owed to Bodnar and Industrial General and are therefore entitled to summary judgment on the breach of contract claim. Counterclaimants contend that MAP is a partnership by estoppel in which each the Individual Counter-Defendants are general partners. As set forth above, we disagree. Counterclaimants further argue that we deny the Individual Counter-Defendants' cross motion because they are liable as partners-in-fact. Again, we disagree.

Counterclaimants, as the party asserting the existence of the partnership, bear the burden of proving that the Individual Counter-Defendants are partners-in-fact. *See Seidmon v. Harris*, 526 N.E.2d 543, 546 (Ill. App. Ct. 1988). Under the Illinois Uniform Partnership Act, "[a] partnership is an association of two or more persons to carry on as co-owners a business for profit." 805 ILCS 205/6(1). Because the Individual Counter-Defendants did not enter into a written agreement defining the purported partnership, we may examine their intent, in addition to the facts and circumstances surrounding the

11

asserted formation, to determine whether a partnership was formed. *See Snyder v. Dunn*, 638 N.E.2d 744, 747 (Ill. App. Ct. 1994).

Here, Counterclaimants concede that prior to their dealings with MAP, the Individual Counter-Defendants had become members of four metals business: McCook Metals, L.L.C., Scottsboro Aluminum, L.L.C., Great Lake Metals, L.L.C., and Great Lakes Processing, L.L.C. Counterclaimants also admit that the Individual Counter-Defendants are members of Longview Aluminum, L.L.C., which in turn completed the Longview Acquisition. Nonetheless, Counterclaimants argue that the Individual Counter-Defendants acted as partners in the time leading up to the creation of each limited liability company. In support of that argument, Counterclaimants point to Babirak's deposition testimony in which he states that the Individual Counter-Defendants referred to each other as "partners." They also emphasize Forte's explanation of the understanding reached between the Individual Counter-Defendants before the creation of each limited liability company that each individual would have an ownership interest in the company after its creation.

Despite Counterclaimants' assertions to the contrary, the intent of the Individual Counter-Defendants is clear. We refuse to infer their relationship to be that of partners simply because that is how these long-standing business associates referred to one another when behind closed doors. Instead, we look to the structure of the entities they created and then presented to the community at large. Those entities are limited liability companies, not partnerships. The Individual Counter-Defendants' intent and action in creating limited liability companies leads us to conclude that a partnership as envisioned under §205/6(1) was not created between them. Indeed, in examining the circumstances leading up to the Longview Acquisition, it is clear that the agreements at issue were entered into by MAP, a limited liability company, not the Individual Counter-Defendants as partners. Lynch's signature appears on each agreement on behalf of MAP as its "Authorized Principal" or "Chairman." As previously explained,

12

because of MAP's limited liability status, the Individual Counter-Defendants cannot be held personally liable for any debts, liabilities or obligations that MAP may have to the Counterclaimants.

The Counterclaimants nonetheless assert that the language of the Non-Disclosure Agreement binds the Individual Counter-Defendants individually. We disagree. The Non-Disclosure Agreement neither refers to nor identifies the Individual Counter-Defendants other than Lynch. Lynch's signature appears on the Agreement as the "Authorized Principal" of MAP. Paragraph six of the Agreement provides that:

> [t]he parties agree that this Agreement [shall] bind any company corporation, organization, partnership, fund, trust or any other association with which they are associated or from which they derive financial benefit and shall further bind any affiliate, employee, consultant, agent, relative or representative of any of the foregoing.

To the extent that MAP or, as the Counterclaimants contend, Longview is liable, the Individual Counter-Defendants are not. Again, as members of those limited liability companies, they cannot be held personally liable for any debts, liabilities or obligations that MAP or Longview may have to the Counterclaimants.

The Counterclaimants finally insist that Lynch is personally liable because he signed or initialed each of the three agreements. Lynch signed the Non-Disclosure Agreement as the "Authorized Principal" of MAP. His signature appeared on another portion of the Agreement without reference to MAP. Lynch initialed the Finder's Fee Agreement and signed the Option Agreement, both of which addressed him as "Chairman" of "Michigan Avenue Partners." Under Illinois law, an agent cannot generally be held liable for a breach of contract by his principal if the agent disclosed that he is acting on behalf of the principal. *See Joe & Dan Int'l Corp. v. United States Fidelity & Guaranty Co.*, 533 N.E.2d 912, 915-16 (Ill. App. Ct. 1988). There is no genuine issue of material fact that Lynch had disclosed to Bodnar that he was acting on behalf of MAP throughout the course of negotiating and entering into the three agreements at issue. Not only can Lynch not be held liable under agency theory,

he also cannot be held liable as a member of MAP, a limited liability company. There remains no genuine issue of material fact as to whether the Individual Counter-Defendants can be held personally liable under Count I of the counterclaim. Accordingly, we grant the Individual Counter-Defendants' motion for summary judgment on the breach of contract claim.

### C. Quantum Meruit

Counterclaimants allege, in the alternative to their claim for breach of contract, that the Counter-Defendants are liable under the theory of quantum meruit. A claim of quantum meruit is based on a quasi-contract theory under which one may be compensated for acts performed for the benefit of another if inequity would otherwise result. *See Midcoast Aviation, Inc. v. General Elec. Credit Corp.*, 907 F.2d 732, 737 (7th Cir. 1990). To state a claim for quantum meruit, Counterclaimants must allege: (1) Bodnar performed a service to benefit the Counter-Defendants; (2) Bodnar performed the service non-gratuitously; (3) the Counter-Defendants accepted the service; and (4) "no contract existed to prescribe payment of this service." *Owen Wagener & Co. v. U.S. Bank*, 697 N.E.2d 902, 908 (Ill. App. Ct. 1998). There is no dispute that, at the very least, the Finder's Fee Agreement and Option Agreement prescribed the terms of payment for Bodnar's services. Consequently, we must deny Counterclaimants motion for summary judgment and grant the Individual Counter-Defendants' cross motion for summary judgment on this claim.

### III. CONCLUSION

For the foregoing reasons, this Court denies the Counterclaimants' motion for partial summary judgment. We grant the Individual Counter-Defendants' cross-motion for summary judgment and deny Kolleng's individual motion for summary judgment as moot. It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated 7/1/03

14